IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE P.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 4140 |
| v. | ) | |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[2] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**[3]

Plaintiff Michelle P. applied for disability benefits on March 13, 2017, when she was 45 years old, alleging she became disabled on December 29, 2016. (R. 189.) Before the Court is Plaintiff's motion seeking remand of the Administrative Law Judge's ("ALJ's") opinion denying her application. (D.E. 18.)[4]

**I. Administrative Record**

Since her alleged onset date, Plaintiff has received treatment for widespread body pain attributed primarily to fibromyalgia;[5] exams consistently showed tenderness over all 18 tender

---

[1] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On August 27, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 10.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

[5] Plaintiff was also diagnosed with "Raynaud's phenomenon" (R. 386), in which areas of the body, such as fingers and toes, feel numb and cold in certain situations (https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571 (last visited May 30, 2023)) and Sjogren's

points,[6] although imaging showed only mild abnormalities. (*See*, *e.g.*, R. 337, 462, 469.) Plaintiff's primary care physician ("PCP"), Karen Casciaro, M.D., and rheumatologist, Lynn Meisles, M.D., prescribed Plaintiff various medications for her pain including prednisone (a coriticosteroid), gabapentin (an anticonvulsant used to relieve nerve pain), lidocaine (a local anesthetic used to relieve nerve pain), Cymbalta (an antidepressant that can help ease the pain and fatigue associated with fibromyalgia), Celebrex (an NSAID that relieves pain and swelling), and tramadol (an opioid analgesic used to relieve moderate to moderately severe pain).[7] Plaintiff also received bilateral hip injections and physical therapy ("PT") to manage her pain. (R. 336-37.)

At an exam in February 2017, Dr. Meisles noted that Plaintiff's tender points were positive, but she had no synovitis (inflammation) and full range of motion ("ROM") in her joints. (R. 337-38.) Later that month, Dr. Meisles decreased Plaintiff's gabapentin because she was feeling "significantly better" despite continued hip pain. (R. 381.) On March 20, 2017, Plaintiff visited Lynn Mershon, D.O., a physical medicine and rehabilitation specialist, to help manage her fibromyalgia pain. (R. 971.) Dr. Mershon noted Plaintiff was "independent for her basic ADLs [activities of daily living] and mobility" but had "difficulty performing simple tasks when she has flares." (R. 972.) Dr. Mershon recommended pool therapy and acupuncture. (R. 973.) In April

---

syndrome (R. 645), an immune system disorder identified by dry eyes and a dry mouth. https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216#Overview (last visited May 30, 2023).

[6] "Fibromyalgia is . . . characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780. Traditionally, doctors diagnosed fibromyalgia after checking how many of 18 specific points on a person's body were painful when pressed. https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785 (last visited May 30, 2023).

[7] For a helpful discussion on the use of these medications in treating fibromyalgia, *see* https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785 (last visited May 30, 2023). Plaintiff is allergic to Lyrica, which is also commonly prescribed to treat fibromyalgia pain. (R. 337.)

2017, Plaintiff filled out a function report indicating that she had difficulty with basic tasks and needed naps on "most days" because of her impairments. (R. 235-36.)

On July 6, 2017, a non-examining state agency medical consultant opined that Plaintiff could perform a range of light work. (R. 96-97.) On July 27, Plaintiff presented to Dr. Meisles with a significant worsening of pain in her feet, knees, ankles, wrists and hands. (R. 386.) Dr. Meisles increased her prescription for Celebrex and gave her a depo-medrol injection to treat joint pain and swelling, which the doctor noted Plaintiff was "quite responsive to." (R. 387.) Dr. Meisles noted Plaintiff was also taking prednisone, Cymbalta, gabapentin and hydroxychloroquine (an anti-malarial that can also be used to treat arthritis). (*Id.*) In August 2017, Dr. Casciaro added a prescription for trazadone to help Plaintiff sleep and noted that Plaintiff was also undergoing acupuncture and water therapy to address her joint pain and stiffness. (R. 644-45.)

In September 2017, Plaintiff wrote in a function report that some days she could not get out of bed due to pain, and she had difficulty with even simple chores and tasks, like hooking her bra and washing her hair, because of pain. (R. 272-73, 276-77.) On other days, she got her kids to school, tries to do some household chores and PT exercises, and takes naps. (R. 272.) Plaintiff wrote that she shopped once a week, with someone's assistance, and someone else usually drove due to her arm pain. (R. 274.) On September 14, Plaintiff returned to Dr. Meisles complaining of severe right shoulder pain radiating down into her hand; Dr. Meisles gave her an injection but the following week, Plaintiff still had shoulder and elbow pain. (R. 649-650.)

On October 19, 2017, Plaintiff told Dr. Meisles she had been enduring worsening pain over the past four days, particularly in her hands; examination revealed all tender points were positive. (R. 647-48.) The following month, Plaintiff was hospitalized overnight after presenting to the emergency room with pain and tenderness throughout her back. (R. 786-87.) She was discharged

with prescription pain medication. (R. 788.) On November 30, 2017, on reconsideration, a non-examining state agency medical consultant opined that Plaintiff was limited to sedentary exertional work, with occasional handling and fingering. (R. 112-14.)

From November 2017 through January 2018, Plaintiff again received PT (R. 1076), and at the end of February 2018 through the beginning of March 2018, Plaintiff underwent a fibromyalgia and chronic fatigue evaluation at the Mayo Clinic. (R. 1344-1348.) The examining physician at the Mayo Clinic confirmed Plaintiff's fibromyalgia diagnosis and her symptoms of diffuse musculoskeletal pain, chronic fatigue, and cognitive difficulties, and recommended Plaintiff engage in targeted physical and occupational therapy, as well as aquatic therapy. (R. 1357-1367.) In April 2018, Dr. Meisles noted that hydroxychloroquine was discontinued after six months without efficacy although Plaintiff's other medications remained the same. Plaintiff continued to complain of diffuse, severe pain all over her body. (R. 1329-30.)

On March 5, 2018, Dr. Casciaro completed a Fibromyalgia Residual Functional Capacity ("RFC") Questionnaire. Dr. Casciaro check boxes indicating that Plaintiff was positive for all relevant fibromyalgia symptoms (including tender points, fatigue, numbness and tingling); that Plaintiff had daily, chronic severe pain throughout her spine, chest, shoulders, arms, fingers, hips, legs, ankles, feet and knees; that Plaintiff's fatigue and pain would interfere frequently to constantly with her concentration; and that she would be absent from work more than three times a month (R. 922-23.)

On August 7, 2018, another non-examining state agency physician gave an opinion on Plaintiff's RFC.[8] Alan Coleman, M.D., opined that Plaintiff could perform a range of light work, with no limitations in pushing or pulling or manipulation. (R. 1004-06.) Dr. Coleman considered

---

[8] It is not clear based on the record how a new state agency opinion came about after reconsideration, but neither party clarifies this in their briefing.

4

Dr. Casciano's March 2018 opinion, suggesting marked activity restrictions, but wrote that those restrictions "cann[o]t be supported by findings on physical exam and by diagnostic testing." (R. 1009.) Dr. Coleman explained that:

> Physical exams have consistently been fully normal except the presence of diffuse musculoskeletal tenderness. Joints normal with full pain-free range of motion throughout. Never any finding of inflammatory arthritis, no synovitis. Recent complaints of right hip pain but normal exam except hip tender, normal hip x-ray (minimal osteoarthritis), dx "bursitis" of hip, treated with steroid injection, non-severe. Exhaustive lab testing for auto-immune or inflammatory or Rheumatic disorders always negative. Plain x-ray of hips reports "mild osteopenia" but this is a non-symptomatic disorder and is non-severe.

(R. 1010.)

After an exam in October 2018, Dr. Meisles wrote that Plaintiff continued to have severe flare ups of her fibromyalgia, and all her tender points were "extremely positive;" Plaintiff was taking tramadol and 600mg of Advil three times a day for pain. (R. 1331.) During aquatic therapy in October and November 2018, Plaintiff's pain and functional limitations were "not as extreme," but outside the pool she continued to have pain in her neck and arms that limited her ROM and made it hard to drive. (R. 1256, 1267, 1303-04.) Plaintiff also exhibited swelling and decreased ROM in her knees that made it difficult to use stairs. (R. 1279.) Plaintiff reported that she was also extremely fatigued; she was able to do light housework but it left her exhausted, and she had to nap after each PT session. (R. 1267, 1279, 1303-04.)

In December 2018 and January 2019, Plaintiff underwent a neuropsychological evaluation with Lance Reinke, Psy.D. He found Plaintiff alert, well-oriented, cooperative, organized and logical, and her mood was congruent with signs of depression. (R. 1020-21.) Plaintiff performed in the average to low average range for attention and needed frequent breaks due to fatigue and pain. (*Id.*) She showed marked difficulty with fine motor skills. (R. 1020, 1023-24.)

5

On March 4, 2019, Dr. Meisles wrote that Plaintiff "continue[d] to have severe pain all over her body and stiffness lasting all day long," and noted that Plaintiff saw a psychiatrist and a psychologist for her chronic pain and related depression. (R. 1332.) In an RFC questionnaire, Dr. Meisles checked boxes indicating that Plaintiff's symptoms of fibromyalgia included multiple tender points, severe fatigue, stiffness, depression, numbness and tingling, impaired concentration, anxiety, cognitive impairments, dizziness and frequent severe headaches; that Plaintiff had pain in her spine, chest, and bilaterally in her shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet; that Plaintiff's fatigue and pain would constantly impact her attention and concentration; and that she would miss more than three days of work per month. (R. 1334.)

On March 5, Dr. Mershon also noted that Plaintiff continued to have body pain, swelling and fatigue, and Dr. Mershon ordered a quad cane for Plaintiff because her gait was ataxic (unbalanced, with poor muscle control). (R. 1314-15.) Dr. Mershon also filled out an RFC questionnaire, checking similar boxes as Dr. Meisles and writing that Plaintiff's pain was "daily, moderate to severe," and she "can barely manage daily self-care," and therefore could not hold down a full-time job. (R. 1336-37.)

## II. Administrative Hearing Before the ALJ

At the hearing on April 18, 2019, Steven S. Goldstein, M.D., an impartial medical expert ("ME"), testified about his review of the record. He testified that although "most of the record shows that . . . [Plaintiff's] less than sedentary," if she "keeps [] up with cardiovascular exercise, and exercise in the swimming pool . . . she could at least function at the sedentary, possibly at light level of activity" with no other physical limitations; he did not give an opinion on her psychiatric or psychological issues. (R. 43-45.) Dr. Goldstein found that "when [Plaintiff] was doing the physical therapy, she was able to improve significantly," to the point of sitting 90 minutes at one

6

time, standing 60 minutes at a time, and doing 15 minutes of cardiovascular exercise "on a repetitive basis," but when she stopped doing PT, she deteriorated again and was unable to function, and restarting PT "was like starting all over again." (R. 43-45, 48-49.)

On cross-examination, Plaintiff's attorney established that most of Plaintiff's PT was in a controlled, aquatic, weightless setting and that she continued to have functional limitations when her PT sessions completed in November 2018. (R. 45-47.) Dr. Goldstein responded that her abilities in aquatic PT continued "after she was out of the water" and that in November 2018, Plaintiff was still able to do light housework such as dusting and minor sweeping, and she was able to do her hair with mild difficulty. (*Id*.) Dr. Goldstein acknowledged that Plaintiff had bad days and was sometimes bedridden the day after PT, but he said he took Plaintiff's bad days into account in assessing her limitations. (R. 47-48.) In addition, despite some PT records indicating limited ROM, Dr. Goldstein explained that he "take[s] the physical therapy examinations of strength and range of motion with a grain of salt" because "[t]hey're not the same thing as a physician's examination," which in this case showed Plaintiff "has tender points but no loss of strength." (R. 49-50.) Dr. Goldstein also acknowledged that there were "complaints of fatigue throughout the record" and no indication Plaintiff was malingering, but he emphasized that Plaintiff "was able to get up to 15 minutes of cardiovascular activity." (R. 50-51.)

Plaintiff testified that she had worked as a pediatric dental assistant until December 2016, when it became too difficult to handle the instruments and help restrain special needs children. (R. 53-55, 61-62.) Before her aunt died in February 2018, Plaintiff arranged care for her when Plaintiff could not care for her herself, and after aunt's death, Plaintiff was executor of her estate. (R. 58, 70-71.) Plaintiff testified that she did very little around the house; she slept on the couch a couple nights a week to avoid walking up the stairs, and she had a hard time with a toothbrush, buttons,

7

zippers, hooking a bra, tying her shoes and washing her hair. (R. 75-76.) Plaintiff had a support group of friends that brought her meals and took her to doctor appointments, although one or two days a week she felt so bad she could not get out of bed. (R. 70-72.) Plaintiff testified that she could only stand or walk 20 minutes before needing to sit due to pain and weakness in her hips and legs, but she had not used a cane until recently due to upper body pain. (R. 65-67.) Her teenage son helped her shop; she used a cart for balance because she sometimes had trouble steering a scooter due to arm problems. (R. 77-78.) She sometimes shopped online and she liked to read, but she had vision problems and trouble focusing for more than 10 to 15 minutes. (R. 65, 76.)

In response to the ALJ's hypothetical, the vocational expert ("VE") testified that a significant number of jobs existed in the national economy for an individual who was limited to sedentary work (sitting up to six hours and standing/walking up to two hours in an eight-hour work day), frequently performing fine manipulations, and frequently reaching except for occasionally reaching overhead. (R. 81-82.) A limitation to occasional forward reaching would eliminate all jobs. (R. 84.) The same work would be available if Plaintiff was further limited to simple and routine tasks that would be performed at a flexible pace. (R. 82.)

**III.    The ALJ Opinion**

On June 26, 2019, the ALJ determined that Plaintiff had severe fibromyalgia and Sjogren's Syndrome but agreed with the consultative examiners that Plaintiff had mild limitations in the Paragraph B criteria and thus no severe mental impairment. (R. 15-17.) The ALJ noted that psychiatric exams performed during medical visits "generally yielded normal results," and Plaintiff had "denied depression on multiple occasions." (*Id*.) The ALJ pointed to treatment notes and function reports reflecting that Plaintiff only reported difficulties with understanding, memory, and attention when her pain or fibromyalgia was bad, and exams in 2018 and 2019 showed only

mild issues despite Plaintiff's reported difficulties. (*Id*.) In addition, the ALJ found that Plaintiff's activities showed she was not more limited, in particular, Plaintiff's ability to be the executor of her aunt's estate, drive, go to the grocery store, shop online, do some cooking, attend hour-long therapy, and do some household chores. (*Id*.) The ALJ also noted that Plaintiff answered questions at the hearing "in a coherent and appropriate manner." (*Id*.)

Next, the ALJ determined that Plaintiff's fibromyalgia, in combination with her other impairments, did not meet or equal a Listing, and assigned Plaintiff an RFC to perform sedentary work, further limited to frequent fine and gross manipulation, frequent reaching, occasional overhead reaching, and no exposure to work hazards, including temperature extremes. (R. 17-19.) The ALJ found Plaintiff's testimony was "not entirely consistent" with other evidence in the record, which "generally does not support the alleged loss of functioning" due to pain, including mostly normal or mild imaging. (R. 20.) The ALJ went through treatment notes documenting that Plaintiff was positive for tender points, frequently complained of severe pain, fatigue and stiffness throughout her body, and had been observed with swelling in her hands, feet and knees and a slow and antalgic gait. (R. 21.) But the ALJ found that "more restrictive findings are not supported by the evidence" because:

- Plaintiff's "physical exams have generally been normal except the presence of diffuse musculoskeletal tenderness" throughout her body "with 18/18 tender points;"

- "[T]here was never a finding of inflammatory arthritis, no synovitis, and x-rays of the claimant's hips revealed only mild osteoarthritis;"

- Plaintiff's "neurological examinations have generally yielded normal results, including, normal sensation and reflexes bilaterally in the upper and lower extremities;"

- EMG and nerve conduction studies on January 11, 2018, were normal;

- Plaintiff's "strength in her extremities has been only slightly reduced at 4/5 or not at all;"

- Plaintiff's "treatment records reflect that she swims several times a week;"

9

- Plaintiff's "treatment records reflect that she suffered a flare up in March 2018, but she was experiencing stress at that time resulting from being executor of her aunt's estate;"

- Plaintiff testified that "she is able prepare some meals, perform some household chores, drive to the grocery store and use a computer to shop online;"

- Plaintiff "responds well to Depo-Medrol injections and the record indicates that she has benefited from aqua therapy;" and

- Plaintiff "was able to do 15 minutes of cardiovascular activity."

(R. 23.) The ALJ further noted that "[w]ith the exception of a few occasions," Plaintiff exhibited a normal gait (R. 18), and ROM throughout her body was full or "within functional limits." (R. 20-21.) Moreover, the ALJ found that although Plaintiff had "difficulty performing simple tasks like brushing her teeth or drying her hair when her symptoms flared up[,] on good days she could drive and do intermittent light home making and housekeeping." (R. 21.) The ALJ found these activities were confirmed in PT notes from 2017 through 2018. (R. 22.)

The ALJ accepted and gave great weight to the opinion of Dr. Goldstein because he was familiar with the disability program, and his opinion was "the most informed and consistent with the overall record." (R. 24.) In addition, the ALJ gave some weight to the November 2017 state agency consultant opinion, which opined that Plaintiff was capable of sedentary work with postural and manipulative limitations, because it was "well supported by other evidence of record," which the consultant "identified [in] particular objective findings." (R. 23.) But the ALJ added limitations to frequent reaching, occasional overhead reaching and frequent handling and fingering, to account for Plaintiff's complaints of pain and weakness. (R. 23-24.) The ALJ also gave some weight to Dr. Coleman's physical RFC opinion, finding it consistent with "diagnostic testing reveal[ing] degenerative changes, but also physical examination findings from the same time not[ing] normal

findings," but the ALJ found that Plaintiff's continued complaints of pain and fatigue warranted limitation to sedentary work. (R. 25.)

The ALJ gave little weight to the RFC opinions of Drs. Casciano, Mershon and Meisles, finding them inconsistent with the record, in particular medical evidence showing Plaintiff had "normal sensation and reflexes and only slightly reduced strength in her extremities." (R. 24-25.) The ALJ also found these opinions and Dr. Reinke's opinion were "not consistent with the criteria used by the Social Security Administration for determining disability." (*Id.*) The ALJ also gave little weight to a third-party function report submitted by Plaintiff's aunt in 2017, which indicated that her aunt took her to appointments and made her meals on bad days, because the aunt was not medically trained, familiar with Social Security standards, nor a disinterested witness. (R. 25-26.)

Finally, the ALJ found that Plaintiff could not perform her past relevant work, but that sedentary jobs existed in significant numbers in the national economy that Plaintiff could perform, such that she had not been disabled since her alleged onset date. (R. 26-28.)

**IV.  Analysis**

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted). "An ALJ need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (internal citations and quotations omitted). Plaintiff primary argument for remand

11

is that the ALJ gave too much weight to the opinion of Dr. Goldstein, and too little weight to the opinions of the treating physicians.

For claims filed before March 27, 2017, such as this one, the ALJ must give a treating physician's opinion "controlling weight if it is supported by medical evidence and is consistent with the record." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 776 (7th Cir. 2022), citing 20 C.F.R. § 404.1527(d)(2). "If an ALJ discounts a treating physician's opinion, the ALJ must adequately articulate the reasons for doing so," *id.*, and then explain that decision by considering the factors in 20 C.F.R. § 404.1527(c), which are the factors the ALJ must consider in deciding the weight to any medical opinion, including that of an ME. These factors include the physician's examining and treating relationship with the claimant, if any; the supportability of the opinion with medical signs and laboratory findings; the consistency of the opinion with the record as a whole; and the physician's specialization. *Id*.

### A. The ALJ's Treatment of Dr. Goldstein's Testimony Was Supported By Substantial Evidence.

Plaintiff primarily takes issue with the ALJ's acceptance of Dr. Goldstein's opinion that her participation in and improvement from PT, which was mostly aquatic, demonstrated that she would be able to function in at least a sedentary work setting, especially where "[a]t best, . . . Plaintiff could sit for 90 minutes at a time and stand for 60. . ." (D.E. 19: Pl.'s Mem. at 10-12.) Courts reviewing ALJs' determinations might weigh evidence like this in any number of different ways, but reviewing courts do not sit as super-ALJs. This Court reviews the ALJ's conclusions to determine only whether they are supported by substantial evidence. *See Bakke*, 62 F.4th at 1068 (where the ALJ finds that "the balance of the evidence" supports the ALJ's conclusion about how to interpret a claimant's functional limitations based on medical records, "[t]his explicit weighing

is precisely within the purview of the ALJ – and it is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome.").

Social Security Ruling 17-2p provides that ALJs "may ask for and consider evidence from medical experts ... about the individual's impairment(s), such as the nature and severity of the impairment(s)," *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022) (quoting SSR 17-2p, 2017 WL 3928306, at *3 (Mar. 27, 2017)),[9] and ALJs commonly rely on MEs in assessing a claimant's RFC. *See*, *e.g.*, *Surprise v. Saul*, 968 F.3d 658, 660 (7th Cir. 2020) (affirming ALJ opinion that gave ME's opinion great weight); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) (affirming ALJ opinion that gave great weight to ME's testimony which was consistent with the objective medical evidence and noting that "[n]o further explanation was required"). Like the ALJ, this Court is not an expert in fibromyalgia, but it is the ALJ's job, and not this Court's, to determine how to weigh the evidence of fibromyalgia. Faced with this task, the ALJ may have recognized that "[a] medical expert may be especially helpful when evaluating the severity of a condition—like fibromyalgia—marked by subjective and fluctuating symptoms." *Gebauer v. Saul*, 801 F. App'x 404, 409 (7th Cir. 2020).[10]

At the hearing, Dr. Goldstein testified extensively in response to the ALJ's questioning, and then Plaintiff's attorney cross-examined Dr. Goldstein at length about his opinions and the evidence used to support them. Dr. Goldstein stated that he took into account not only the objective

---

[9] The rule that ALJs "may also ask for medical evidence from expert medical sources," is currently codified under 20 C.F.R. § 404.1513a(b)(2).

[10] By contrast, in *Gerstner v. Berryhill*, 879 F.3d 257 (7th Cir. 2018), the Seventh Circuit found that the ALJ overstated findings from tests and physician recommendations in concluding the claimant was not disabled from fibromyalgia, reasoning that "[t]he ALJ's analysis reveal[ed] that he misunderstood the nature of [] fibromyalgia pain," which "cannot be measured with objective tests aside from a trigger-point assessment." *Id*. at 264-65, citing http://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/diagnosis/dxc-20317823.

medical record, but also Plaintiff's reports of bad days and fatigue throughout the record in assessing her limitations. (R. 47-48.) Dr. Goldstein acknowledged one report that Plaintiff was so fatigued after PT that she was essentially bedridden the next day, but Dr. Goldstein testified that "if you overdo it, that will happen. But the trick is to keep repetitive activity and gradually do better," and Plaintiff "was actually able to gradually do better." (R. 45.) Dr. Goldstein said that it was "normal" to have good days and bad days, but that "as one improves, what happens is the bad days become better, and your good days get better." (R. 47-48.) Dr. Goldstein testified that Plaintiff had bad days because she "stopped and then started again" with therapy so "it was like starting all over again, "[g]etting better and then worse, and then she got better because she went back and got physical therapy ordered again." (R. 49.) Dr. Goldstein also testified that he took the PT exams "of strength and [ROM] with a grain of salt," because "[t]hey're not the same thing as a physician's examination," which "show[ed] that strength is normal." (R. 50.)

The ALJ recited Dr. Goldstein's testimony in detail in the opinion and found that Dr. Goldstein's testimony that Plaintiff deteriorated each time she stopped PT but that if she "were active in a controlled setting like physical therapy, then she would be able to function in in a work setting, at least at the sedentary level, is supported by [Plaintiff's] treatment records that reflect significant improvement following physical therapy." (R. 24.)[11] The ALJ reviewed Dr. Goldstein's testimony in light of the Section 404.1527(c) factors, recognizing that Dr. Goldstein had not examined nor treated Plaintiff,[12] and determined that Dr. Goldstein's education, experience and

---

[11] Plaintiff correctly points out that improvement is only meaningful to the extent an individual has improved enough to be capable of sustaining full time employment. (Pl.'s Mem. at 12.) But that is what the ME and the ALJ concluded, that the evidence showed that with PT, Plaintiff improved enough to perform full-time work.

[12] Although Dr. Goldstein was not a rheumatologist like the ME in *Gerbauer*, MEs need not be, and often are not, experts in the field of a claimant's particular impairment. *See*, *e.g.*, *Plessinger v. Berryhill*, 900 F.3d 909, 914 (7th Cir. 2018) (noting that an ME's specialty "did not disqualify him as a matter of law from

14

training (board certified in internal medicine and neurology),[13] his familiarity with the disability program rules, and his opportunity to review the record in its entirety, made his opinion "the most informed and consistent with the overall record," and the ALJ relied on Dr. Goldstein's conclusion that "there is no indication in the record that [Plaintiff] cannot be more active." (*Id*.)

The Seventh Circuit has affirmed many ALJ opinions giving great weight to ME opinions on the same or similar grounds. *See*, *e.g.*, *Gebauer*, 801 F. App'x at 409; *Ray v. Saul*, 861 F. App'x 102, 104, 106 (7th Cir. 2021) (upholding ALJ opinion that gave great weight to opinions of ME and state agency consultants "because their opinions aligned more with the totality of the evidence in the medical record"); *Apke v. Saul*, 817 F. App'x 252, 256 (7th Cir. 2020) (affirming ALJ opinion giving great weight to ME's testimony because "[a]n opinion is entitled to controlling weight only if it is supported both by medical findings and a consistent record"); *Urbanek v. Saul*, 796 F. App'x 910, 912 (7th Cir. 2019) (affirming ALJ opinion that "appropriately relied on [the ME's] testimony to formulate" the claimant's RFC, where ME acknowledged the claimant's moderate limitations but concluded that the record did not support the severity of the claimant's self-reported symptoms). We rely on the foregoing unpublished orders (and their limited precedential value) with great care; here, their similar outcomes illustrate why this Court will not second-guess the ALJ's reliance on the ME's opinion here, under the highly deferential substantial evidence standard of review. In the one recent case the Court found in which the Seventh Circuit

---

being able to opine on the meaning of [the claimant's] medical records"). Moreover, "[b]ecause many of the signs and symptoms of fibromyalgia are similar to various other disorders, you may see several doctors before receiving a diagnosis. Your family physician may refer you to a doctor who specializes in the treatment of arthritis and other similar conditions (rheumatologist)." https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785 (last visited May 30, 2023).

[13] The ALJ mistakenly wrote that Dr. Goldstein was also board certified in psychiatry, but this error is of no import because Dr. Goldstein did not testify as to Plaintiff's alleged mental impairments.

15

held that an ALJ erred by giving great weight to an ME's testimony, *Plessinger v. Berryhill*, 900 F.3d 909 (7th Cir. 2018), the appellate court's determination was based on concerns not applicable here. In that case, "the ALJ's entire explanation" for deferring to the ME's opinion was that the ME "had the opportunity to review the medical evidence of record," but the ALJ only "assumed" the ME was familiar with all of the medical evidence, and "did not point to the corroborating record evidence." *Id.* at 915. In addition, the ALJ in *Plessinger* "deferred entirely to the [ME's] testimony" despite the ME's explicit caveat that he had "not taken into account [the claimant's] complaints" of pain; yet, the ALJ "failed . . . to actually conduct that analysis himself" of the credibility of the claimant's complaints of pain. *Id.* at 914-17.

In contrast to the ME in *Plessinger*, Dr. Goldstein testified that he took into account Plaintiff's reports of bad days and fatigue throughout the record in assessing her limitations. (R. 47-48.) In addition, the ALJ here did not cede the credibility determination to the ME, but rather explained his conclusion that Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent because the evidence demonstrates that [Plaintiff's] impairments do not preclude her from working entirely" with multiple citations to the record. (R. 20-23.) Indeed, although Plaintiff contends that Dr. Goldstein's view of PT exams was "unsupported skepticism" (Pl.'s Mem. at 13), Dr. Goldstein's decision to "take the physical therapy examinations of strength and range of motion with a grain of salt" (R. 49-50) was based on his experience with PT and doctor reports, but he left the credibility determination to the ALJ.

**B.    The ALJ's Decision To Give Little Weight to the RFC Opinions of Plaintiff's Treating Physicians Was Supported By Substantial Evidence.**

Plaintiff next contends that the ALJ improperly rejected the opinions of Drs. Mershon, Meisles, Casciaro and Reinke "[w]ithout any cogent explanation." (Pl.'s Mem. at 13.) Although a reviewing court may have come to a different conclusion after weighing the evidence, the ALJ

16

here provided an explanation that included a review of each of the Section 404.1527(c) regulatory factors. As we explain below, this meets the Seventh Circuit's minimal articulation standard, and thus the Court must find that the ALJ's opinion meets the deferential substantial evidence standard.

Drs. Mershon, Meisles and Casciaro all opined Plaintiff could not work, would be absent more than three days per month and would be frequently or constantly limited by pain and fatigue. (R. 20-21, 24-25.)[14] The ALJ separately, although similarly, determined that these opinions were entitled to little weight because they were "not consistent with the medical records that reflect the claimant has normal sensation and reflexes and only slightly reduced strength in her extremities" and "fail[ed] to provide any support for the claimant missing more than 3 days of work each month." (R. 24-25.) The ALJ also found that the opinions were inconsistent "with the criteria used by the Social Security Administration for determining disability," presumably that it is the ALJ's job to determine the ultimate issue of disability. (*Id*.)[15] *See* 20 C.F.R. § 404.1527(d). Instead, the ALJ found the opinions of Dr. Goldstein and the State agency consultants were more consistent with the record and used them as a guide in formulating Plaintiff's RFC.

Plaintiff argues that the ALJ failed to recognize the consistency of the opinions of Drs. Mershon, Meisles and Casciaro with each other and with Dr. Reinke's opinion that Plaintiff could not work due to cognitive and physical deficits. (Pl.'s Mem. at 14.) In addition, Plaintiff contends that the ALJ "relied upon a false equivalency, suggesting that findings of normal strength, sensation, and reflexes somehow negate findings of debilitating pain and fatigue." (*Id*. at 15.) The

---

[14] Although the ALJ did not point this out, the Court notes that these doctors' opinions are found in identical two-page, check-the-box forms, and "ALJs should give more weight to medical opinions with more internal explanation and support than to those without." *Bakke*, 62 F.4th at 1068.

[15] The Court shares Plaintiff's confusion with the ALJ's statement that the doctors are not VEs because they "ventured no opinions as to the exact requirements of various jobs or the availability of those jobs." (Pl.'s Mem. at 15.) But if this was error, it was harmless because it does not negate the ALJ's other reasoning, which this Court has found adequate.

Court sees room for some of Plaintiff's skepticism about the particular import of the findings as to strength, sensation and reflexes, but the ALJ provided additional "elaboration and analysis" for giving their opinions little weight, albeit "elsewhere in the decision," *Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021), and "[a]n ALJ need not rehash every detail each time he states conclusions on various subjects." *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021). Earlier in the opinion, the ALJ discussed in detail the treatment notes and examination results of Drs. Mershon, Meisles and Casciaro, and the ALJ explained that he found them inconsistent with Plaintiff's complaints that she was debilitated due to pain and fatigue. (R. 20-23.) The necessary conclusion is that the RFC opinions of these doctors finding Plaintiff debilitated due to pain and fatigue were inconsistent with the doctors' treatment notes and examination results. Thus, the ALJ met the low burden to "minimally articulate [his] reasoning when giving a treating physician's opinion less than controlling weight." *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022).

### C. Any Error in the ALJ's Decision To Exclude Non-Exertional (Mental) Limitations in the RFC Was Harmless.

Finally, Plaintiff contends that the ALJ erred by failing to include in the RFC "any deficiencies the Plaintiff may have in concentration, persistence, or pace, and limitations arising out of non-severe impairments." (Pl.'s Mem. at 15.) But the ALJ found that Plaintiff had only mild limitation in concentrating, persisting or maintaining pace (R. 17),[16] and "it is unclear what kinds of work restrictions might address [Plaintiff's] limitations in concentration, persistence, or pace because [s]he hypothesizes none." *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021), quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Moreover, as Defendant points out, the VE

---

[16] Plaintiff claims that the ALJ relied on Dr. Goldstein's opinion that she had no non-exertional limitations (Pl.'s Mem. at 14), but Dr. Goldstein explicitly declined to comment about any psychiatric or psychological issues (R. 45, 50), and the ALJ did not rely on Dr. Goldstein's opinion during his detailed assessment of Plaintiff's mental impairments. (R. 16-17.)

testified that if limitations were added to the RFC for simple and routine tasks and jobs with a flexible pace and only end-of-day production requirements, the number of available jobs would not be affected. (D.E. 28: Def.'s Resp. at 13, citing R. 81-82.) Thus, any error in failing to include such limitations in the RFC would be harmless.

## CONCLUSION

For these reasons, the Court denies Plaintiff's motion to remand (D.E. 18) and affirms the ALJ's decision. The Court sees room for skepticism about Dr. Goldstein's opinion that Plaintiff would improve enough to work full time if she continued doing PT, with no evidence as to how much PT would be required to do so, and about part of the ALJ's reasoning as to the treating physicians. But the ALJ "consider[ed] all relevant medical evidence" and nevertheless sufficiently "explain[ed] why particular medical opinions [Dr. Goldstein's and the State agency consultants'] are consistent with the record as a whole," *Bakke*, 62 F.4th at 1067, and deserved more weight than the opinions of the treating physicians, such that the ALJ's opinion was supported by substantial evidence. Plaintiff disagrees with the ALJ's decision to give greater weight to Dr. Goldstein and the State agency physicians, but under Seventh Circuit law, the Court must decline Plaintiff's invitation to reweigh the testimony. The ALJ decision is affirmed.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: May 30, 2023**